# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

DAVID S. GRONIK, JR. and MARY K. GRONIK,
S.C.G.,
M.A.G.,
DAVID S. GRONIK, JR. LIVING TRUST,
by Its Trustee David S. Gronik, Jr.,
OPIO BOAT MOON, LLC,

       Plaintiffs,

    v.                                            Case No. 10-CV-954

SUSAN BALTHASAR and
ESTATE OF NORMAN J. BALTHASAR,
by Susan M. Balthasar as Personal Representative
of the Estate of Norman J. Balthasar,

       Defendants and Third-Party Plaintiffs,

    and

WEST BEND MUTUAL INSURANCE COMPANY,

       Intervenor Plaintiff,

    v.

SHOREWEST REALTORS, INC.,
CONTINENTAL CASUALTY COMPANY, and
ANNE SCHWARTZ,

       Third-Party Defendants,

    and

OPIO BOAT MOON, LLC, and DAVID S. GRONIK, JR.,

       Plaintiffs,

    v.

CHUBB INDEMNITY INSURANCE COMPANY,

       Defendant.

## THE GRONIKS' CIVIL L.R. 56(b)(2)(B)(ii) STATEMENT
## OF ADDITIONAL FACTS

The Plaintiffs, David S. Gronik, Jr., Mary K. Gronik, S.C.G., M.A.G., the David S. Gronik, Jr. Living Trust, and Opio Boat Moon, LLC (the "Groniks" or "Plaintiffs"), pursuant to Federal Rule of Civil Procedure 56 and Civil Local Rules 7 and 56(b)(2)(B)(ii), submit the following statement of additional facts in opposition to Chubb's motion for partial summary judgment (DN 516):

### The Groniks' Three Insurance Claims

**A.    The Policy.**

1.    The Groniks' Chubb Masterpiece Policy, number 10781993-04 (the "Policy"), covered the property located at 7736 North Beach Drive, Fox Point, Wisconsin 53217 (the "Property") beginning on October 22, 2009, and has been in effect for all periods relevant to the Groniks' losses.  (11-CV-697, DN 9, ¶ 10.)

2.    The Policy is an "all risk" policy that covers "all risk of physical loss to the Property unless stated otherwise or an exclusion applies."  (Halloin Aff. Ex. D, July 25, 2012, Mortensen Dep. 174:6–10, 188:25–190:6; Halloin Aff. Ex. E, July 25, 2012, Mortensen Dep. Ex. 6-G.)

**B.    Claims Made Under the Policy.**

3.    The Groniks have made three insurance claims under the Policy that are at issue in this lawsuit.  These claims arise out of damage associated with storms that occurred on October 23, 2009,[1] July 14–15, 2010,[2] and July 22, 2010.  The

---

[1] There was a dispute that related to when the Groniks reported the damage first discovered on October 23, 2009.  Mr. Gronik testified that he reported the damage to his Chubb agent on November 2, 2009, but that she responded that there was no coverage.  (Halloin Aff. Ex. F, Oct. 24, 2012, D. Gronik Dep. 524:8–529:1.)  Chubb initially contested Mr. Groniks' testimony, but apparently no longer does; a Chubb employee inspected the damage on that same date, November 2, 2009.  (Halloin Aff. Ex. G, Oct.

2

Groniks asserted a separate claim for damage arising out of each of these three storm events and submitted to Chubb three Proofs of Loss. (Halloin Aff. Ex. B, July 25, 2012, Mortensen Dep. Ex. 11.) Each of the Proofs of Loss stated that the Property was a total loss. (*Id.*)

### C. Chubb's February 11, 2011, Adjustment of the Groniks' Claims.

4. In a letter dated February 11, 2011, Chubb, through its counsel, Fred Strampe, issued its coverage determination. (Halloin Aff. Ex. I.)

5. Attached as Exhibit 3 to the coverage determination was an itemized report of the damage that Chubb contends was covered, which was prepared for Chubb by estimator Geof Johnson of Belfor Property Restoration. (Halloin Aff. Ex. C.)

### D. Chubb Invokes the Policy's Appraisal Provision.

6. Based upon Mr. Johnson's report, Chubb's February 11, 2011, letter included checks to the Groniks totaling $318,213.75 ($3,109.85 + $58,651.60 + $256,452.30). (Halloin Aff. Ex. J.) Those checks were dated February 10, 2011. (*Id.*)

7. The Groniks objected to Chubb's claims adjustment (the amount of which was based solely upon Mr. Johnson's report), and Chubb advised that it would

---

5, 2012, Shelledy Dep. 186:6–187:14.) Due to this prior dispute, the October 23, 2009, storm claim is sometimes referred to as the "June 29, 2010, claim."

[2] The July 14–15, 2010, claim is sometimes referred to as the "July 14, 2010, claim" or the "July 15, 2010," claim because the storm spanned those two days. (Halloin Aff. Ex. H.)

3

submit the Groniks' claims to the appraisal process[3] provided under the Policy. (Hallion Aff. Ex. L, June 24, 2011, Strampe/Hallion Letter.)

8.    The Groniks objected to the appraisal process because Chubb had never priced the entire loss, and the appraisal process is reserved for situations where there are two sets of competing damage numbers for the appraisers to resolve. (11-CV-697, DN 13.)

9.    On November 14, 2011, the Groniks' expert, Anthony Enea of Ruvin Bros. Artisans & Trades, Inc., issued a report that provided a detailed itemization of all of the Groniks' damages. (Hallion Aff. Ex. M.) On page 8 of Mr. Enea's report, he examined Mr. Johnson's report upon which Chubb's February 11, 2011, adjustment was based. (*Id.*) Mr. Enea opined that Mr. Johnson had underestimated the actual pricing for the repairs Mr. Johnson recommended by $27,221.42. (*Id.*) However, Mr. Enea cautioned that he did *not* agree with the quantities or scope of work estimated by Mr. Johnson. (*Id.*)

---

[3] The appraisal provision in the Policy reads:

"If you or we fail to agree on the amount of loss, you or we may demand an appraisal of the loss. Each party will select an appraiser within 20 days after receiving written request from the other. The two appraisers will select a third appraiser. If they cannot agree on a third appraiser within 15 days, you or we may request that the selection be made by a judge of a court having jurisdiction. Written agreement signed by any two of the three appraisers shall set the amount of the loss. However, the maximum amount we will pay for a loss is the applicable amount of coverage even if the amount of the loss is determined to be greater by appraisal. Each appraiser will be paid by the party selecting the appraiser. Other expenses of the appraisal and the compensation of the third appraiser shall be shared equally by you and us. We do not waive our rights under this policy by agreeing to an appraisal."

(Hallion Aff. Ex. K.)

4

10. After being provided with Mr. Enea's report on November 15, 2011, Chubb advised that it planned to perform a complete analysis of Mr. Enea's repair and replacement cost estimates. At the same time, however, Chubb continued to insist that the appraisal process begin in earnest. Counsel for the Groniks and Chubb agreed to how the appraisal process was to work, which included an agreement that "no exclusions will be addressed" and that Chubb was to provide its analysis of Mr. Enea's estimates within roughly three weeks of May 30, 2012. (DN 520-3, p.2.)

11. Without providing the reports, Chubb then twice moved this Court to appoint the third appraiser. (DNs 79, 100.)

12. On June 27, 2012, the Court appointed Dr. Donald Buettner as the third appraiser. (DN 150.)

13. However, the appraisal process could not yet begin because Chubb had not yet produced its analysis of Mr. Enea's estimates. On October 1, 2012, Chubb did provide its expert's analysis of Mr. Enea's estimates (DN 187), which are contained in Mr. Johnson's three reports (Halloin Aff. Exs. N, O, P.)

14. Mr. Johnson's three reports consist of (1) a cost of repair report, (2) a replacement cost report, and (3) a comparative cost estimate. (Halloin Aff. Exs. N, O, P.)

15. Notably, none of Mr. Johnson's new reports addressed any of the damages contained in his initial report that was attached as Exhibit 3 to the February 11, 2011, adjustment letter, which had (subject to the $27,221.42 dispute) already

5

been paid by Chubb. (Halloin Aff. Exs. C, N, O, P.)

**E.    The Appraisal Process Begins.**

16.    Mr. Enea analyzed Mr. Johnson's three reports as quickly as possible, issuing an introductory letter to Dr. Buettner, the third appraiser, on December 5, 2012, and a rebuttal expert report on February 7, 2013. (Halloin Aff. Exs. Q, R.)

17.    Mr. Enea reiterated that the appraisal process should address the following issues:

    a.    The Groniks were contending that the Property was a total loss; thus the Groniks requested specific findings from the appraisers regarding the Property's square footage to facilitate calculating the Property's replacement cost. (*See* Halloin Aff. Ex. M, p.13; Halloin Aff. Ex. O, p.3.)

    b.    The $27,221.42 dispute over the damages contained in Mr. Johnson's initial report, which was attached as Exhibit 3 to the February 11, 2011, adjustment letter. (*See* Halloin Aff. Ex. C; Halloin Aff. Ex. M, p.8.)

    c.    The dispute between Mr. Enea and Mr. Johnson regarding all remaining items. (*See* Halloin Aff. Ex. M; Halloin Aff. Exs. N, P.)

18.    Although some initial discussions amongst the three appraisers occurred during the fall of 2012, Dr. Buettner left the Milwaukee area for the winter. (Enea Aff. ¶ 1.)

19.    Upon Dr. Buettner's return to the area in April 2013, the appraisers again began working on the appraisal. (Enea Aff. ¶ 2.)

20.    During the process, despite the agreement to the contrary, a dispute arose as to

whether the appraisers should address the cause of the damage at the Property; the Court ruled that the appraisers should *not* address cause. (DN 468.) The Court also ordered that the appraisal process be completed by May 29, 2013. (DN 471.)

21. During May 2013, Messrs. Enea and Hall held a productive series of meetings in which they compared the Johnson and Enea reports and sorted the items into two categories: (1) a list of items where they agreed on price, and (2) a list of items that they believe are repair costs that address or involve the issue of cause. (*See* DNs 485-1, 485-3, respectively.)

22. Messrs. Enea and Hall also agreed that the square footage contained in the as-built drawings could be used for determining the replacement cost of the Property. (DN 485, ¶ 9.)

23. Near the end of the appraisal process, Mr. Hall advised Mr. Enea that he was not retained to resolve the $27,221.42 dispute over the damage list contained in Mr. Johnson's initial report that was attached as Exhibit 3 to the February 11, 2011, adjustment letter. (DN 485, ¶ 14.)

24. The party-appointed appraisers submitted a very small list of items to the third appraiser, Dr. Buettner. (DN 485-4.)

25. While he worked to resolve his list of issues, the Court ordered Dr. Buettner to disclose conflicts. (DN 468.)

26. Apparently frustrated by having to disclose his conflicts, Dr. Buettner signed Mr. Hall's draft appraisal award and has yet to discuss or respond to remaining

issues with Mr. Enea.  (Enea Aff. ¶ 3.)

27. Dr. Buettner's itemization of the disputes submitted to him for resolution has been filed with the Court.  (DN 485-5.)

   **F.    The Award.**

28. On or about May 29, 2013, Mr. Hall and Dr. Buettner signed the Award, which was filed with this Court on May 31, 2013.  (DN 485-2.)

29. The Award states, in relevant part:

| | |
|---|---|
| Damages to Dwelling caused by Wind and Water events (fortuitous) | 869,392.40[4] |
| Other Damage needing to be corrected "cause not addressed" | 162,742.61 |
| This does not address the Windows to be addressed in the near future | |
| The appraisal does not address deductible and pre payments if any. | |

(DN 485-2.)

30. The first category refers to the list that Messrs. Enea and Hall agreed to as the amount of damages.  (*See* DN 485-1.)  However, the title, "Damages to Dwelling caused by Wind and Water events (fortuitous)" are Mr. Hall's words;  Mr. Hall and Mr. Enea never agreed to label losses as "fortuitous," and Mr. Enea does not even know what this concept means.  (Enea Aff. ¶ 5.)

31. The title of the second category, "Other Damage needing to be corrected 'cause not addressed'," also utilizes language that Mr. Hall and Mr. Enea did not agree upon.  (Enea Aff. ¶ 6.)

_____

[4] Mr. Hall's spreadsheet computed the amount that wound up in the Award, $869,392.40, whereas Mr. Enea's spreadsheet computed a total for the same items of $875,606.56.  (DN 485, ¶ 22.) Mr. Hall and Dr. Buettner refuse to respond and address this issue.  (Enea Aff. ¶ 4.)

32. Mr. Enea does not understand why the items in the second category were broken out separately from the first category. (Enea Aff. ¶ 7.)

33. The language referring to the windows is intended to be a placeholder for the window estimate that the appraisers agreed to obtain, but could not obtain, until after the Court-ordered appraisal deadline of May 29, 2013. (DN 471.)

34. On July 1, 2013, Mr. Enea provided the window pricing directly to the Court. (DN 523.) The window award contains two components: (1) the distributor's price for the window units; and (b) the cost to install the windows provided by Mr. Enea. (*Id.*)

35. The fourth item listed on the Award, which states," This appraisal does not address . . . pre payments, if any," is a reference to Mr. Johnson's report that was attached as Exhibit 3 to the February 11, 2011, adjustment letter. (Halloin Aff. Ex. C.) While most of those itemized damages have been pre-paid, there remains a $27,221.42 dispute that Mr. Hall advised could not be addressed. (DN 485, ¶¶ 13–14.)

## Issue # 1: Whether Chubb's Investigation and Use of the Appraisal Process Were Engaged in Bad Faith

36. After the appraisers issued the Award, in a letter dated June 27, 2013, Chubb acknowledged that the Policy covers $656,353 of the Award. (Halloin Aff. Ex. S.)

## Issue # 2: Dr. Buettner's Conflict of Interest

37. In mid-May 2013, the Groniks learned of Dr. Buettner's significant prior working relationship with Chubb and Chubb's counsel, Borgelt, Powell, Peterson

9

& Frauen, S.C. (the "Borgelt firm"). (DN 485-6.)

38. This information was not previously disclosed by Dr. Buettner, Chubb, or the Borgelt firm during the process of selecting a third appraiser. (Halloin Aff. ¶ 36.)

39. Upon learning of the prior relationship, the Groniks immediately objected on the basis of evident partiality and the fact that Dr. Buettner was not a disinterested appraiser as required under Wisconsin law. (Halloin Aff. ¶ 37.)

40. Attorney Halloin never represented Dr. Donald Buettner or his company. (Halloin Aff. ¶ 38.)

41. It was Chubb who brought Dr. Donald Buettner to the table and suggested him as an appraiser. (Halloin Aff. ¶ 39.)

42. Chubb's counsel also specifically advised that Dr. Buettner had no conflicts, which was untrue. (Halloin Aff. ¶ 40.)

43. The Groniks' objection was raised within 24 hours after learning of Dr. Buettner's prior involvement with Chubb and the Borgelt firm and before his appraisal was complete.[5] (Halloin Aff. ¶ 41.)

44. Dr. Buettner's company has been retained by Chubb "over a long time for a number of forensic investigations." (DN 485-6, p.2.)

45. Dr. Buettner was the Principal Investigator in some of the matters for which Dr. Buettner's company was retained by Chubb. (DN 485-6, p.2.)

46. Dr. Buettner's services for Chubb "were almost always related to a building

---

[5] The Court's minutes from the May 10, 2013, status conference state, "Parties should continue with the appraisal process. Court can resolve the issue of neutral appraiser's potential conflict." (DN 468.)

Case 2:10-cv-00954-LA   Filed 07/22/13   Page 10 of 22   Document 542

problem, including structural problems, roofing problems and other water leakage problems and foundation problems." (DN 485-6, p.2.)

47. Dr. Buettner's company continues to do work for the Borgelt firm and various Chubb companies, and Dr. Buettner continues to receive payment from the company for his company stock. (DN 485-6, pp.3–7.)

48. The records provided by Dr. Buettner show that his company has been involved in roughly 50 matters for which the client was either Chubb or the Borgelt firm, that Dr. Buettner was the "Principal-in-charge" of roughly 34 of these matters, and that Dr. Buettner was the assigned project manager for roughly 9 of these matters. (DN 485-6, pp.4–7.)

49. Because Mr. Enea and Mr. Hall were able to agree on the two lists (*see* DN 485, ¶¶ 22, 24; DN 485-1; DN 485-3), the total dollar amount of items actually addressed by Dr. Buettner was limited to $306,994.49. (DN 485-4, pp.1–3.)

## Issue # 3: The Windows

50. The appraisers agreed to obtain from a Marvin Windows distributor an estimate to repair the windows, which Mr. Enea provided to the Court. Mr. Enea's cost to replace the windows is $843,345.14, inclusive of materials and labor. (DN 523, ¶ 4.) This number consists of the distributor's third-party estimate of the cost of the windows, the third-party estimate to install the windows, as well as overhead and profit. (DN 523.)

## Issue #4: Causation

51. The Court ordered that the appraisers need not determine the cause of each

11

item of damage.  (DN 468.)

52.  The appraisers never addressed major issues related to cause, other than to compile a list of those items, which Mr. Enea submitted to the Court.  (*See* DN 482-3.)

53.  These items for which neither cause nor coverage have been decided total $2,315,945.15 in damage.  (DN 482-3.)

54.  Chubb and its experts do not dispute that the roof of the Main House leaks.  A diagram of those leaks shows that more than twenty leaks have been observed.  (Halloin Aff. Ex. T, Dec. 6, 2012, Domel Dep. Ex. 17.)

55.  As recently as December 20, 2012, Chubb's expert, Geof Johnson, testified that he observed active water leaking in the attic spaces beneath the Main House roof.  (Halloin Aff. Ex. U, Jan. 11, 2013, Johnson Dep. 419:8–425:3.)

56.  Video recorded that same day shows water cascading down the attic walls.  (Halloin Aff. Ex. V.)

57.  Chubb's engineering expert testified specifically that he never did any sort of "age" analysis of the roof.  (Halloin Aff. Ex. W, Nov. 6, 2012, Fischer Dep. 205:8–14.)

58.  Chubb's experts have opined that roughly 130 windows in the Main House are damaged and should be replaced.  (Halloin Aff. Ex. X.)

59.  Despite this observed damage, however, Chubb's experts have not provided an explanation for *why* so many windows have failed in the Main House.  (Halloin Aff. Ex. X.)

12

60. The Groniks' experts have determined that the Main House windows have failed due to the racking of the structure, whereby the entire building experiences excessive lateral movement. (Halloin Aff. Ex. Y.)

61. The Groniks' engineering expert has opined that the original construction of the Main House was code compliant when built. (Halloin Aff. Ex. Z, July 26, 2012, Corrigan Dep. 20:12–22:18.)

**Issue # 5: There Are Unresolved Disputes Relating to Exhibit 3 to the February 11, 2011, Adjustment Letter, Which Was Submitted to the Appraisal Process**

62. The Groniks submitted their disputes relating to Exhibit 3 to the February 11, 2011, adjustment letter to the appraisal process. (DN 485, p.4, ¶¶ 12–14.) The dispute was $27,221.42. (DN 485, p.4, ¶ 13.)

63. Just prior to issuing the Award, Mr. Hall informed Mr. Enea that he was not designated to appraise these claims and that he did not plan to address the issue. (DN 485, p.4, ¶ 14.) The appraisers did not address or discuss the July 14–15 and 22, 2010, claims and the appropriateness of the payments made by Chubb.

**Issue # 6: The Award's Use of the Word "Fortuitous"**

64. The Award states:

| Damages to Dwelling caused by Wind and Water events (fortuitous) | 869,392.40 |
| Other Damage needing to be corrected "cause not addressed" | 162,742.61 |

(DN 485-2, p.2.)

65. Chubb has repeatedly represented that the appraisal process was only intended to address the amount of the loss, and not to address any coverage issues,

13

including cause.  (Halloin Aff. Ex. L.)

66.   During the appraisal, the appraisers did not discuss any coverage issues, including the concepts of fortuity and betterments.   (Enea Aff. ¶ 8.) Nevertheless, when Mr. Hall prepared the Award that Dr. Buettner also signed, he inserted the word "fortuitous."  (DN 485-2, p.2.)

## Issue # 7: Chubb's Error in Payment Based Upon the Award

67.   After the Award was issued, Chubb mailed to the Groniks a letter dated June 27, 2013, that states that it does not dispute that $661,383.61 of the Award is covered under the Policy.  (Halloin Aff. Ex. S.)

68.   Despite coverage for this amount of the Award, however, Chubb issued a check for only $179,502.91.  (Halloin Aff. Ex. S.)

69.   Chubb has paid to the Groniks $521,210.98.  The following payments have been made (excluding the June 27, 2013, payment):

| Check Date | Amount |
|---|---|
| February 10, 2011 | $3,109.85 |
| February 10, 2011 | $58,651.60 |
| February 10, 2011 | $256,452.30 |
| June 13, 2011 | $22,681.33 |
| July 19, 2011 | $1,370.05 |
| August 3, 2011 | $138,368.52 |
| August 3, 2011 | $1,314.11 |
| August 3, 2011 | $24,311.02 |
| August 10, 2012 | $2,309.40 |

14

| October 3, 2012 | $12,642.80 |
| --- | --- |
| **TOTAL** | **$521,210.98** |

(Halloin Aff. Ex. AA.)

## Issue # 8:
## Dr. Buettner's Use of Exclusions and the Word "Betterment"

70.  The parties agreed that "no exclusions would be addressed" in the appraisal process. (DN 520-3, d.)

71.  Dr. Buettner refused to price damage items priced by Mr. Enea because he believed that they were excluded based upon his understanding of the Policy's exclusions, including "wear and tear" and a "betterments" exclusion. (DN 485-5.)

72.  Dr. Buettner awarded $4,859.98 to repair and replace insulation in at the Property. (DN 485-5, p.2.)

73.  The Policy requires Chubb to pay for certain "betterments" under the Policy's "Rebuilding to Code" provision: "We cover the cost of conforming to any law or ordinance that regulates the repair, rebuilding, or demolition of your house ...." (Halloin Aff. Ex. BB.)

74.  Mr. Enea has opined that the insulation he priced (and Dr. Buettner refused to price) is necessary to comply with the Wisconsin Energy Code requirements for R-value of insulation. (DN 485, p.7.) Chubb has provided no competing testimony.

## Issue # 9: The Math Error

75.     During the final days of the appraisal, after the issue with Dr. Buettner's conflict arose, the spreadsheets used by Mr. Hall and Mr. Enea to calculate the amount of the Award totaled different amounts: Mr. Hall's total was $869,392.40, whereas Mr. Enea's total was $875,606.56. Mr. Enea alerted Mr. Hall and Dr. Buettner of this math error, but Mr. Hall and Dr. Buettner both signed the Award without addressing the issue. (Enea Aff. ¶ 4.)

## Issue # 10: Total Loss

76.     Mr. Enea's expert report states:

> "[I]t is impossible to rebuild this structure to be precisely what it was, as significant structural stiffness must be added. The repairs needed to the structure will require the removal of some of the lake view windows, an inadequate pool HVAC system and other items that will make the house underperform functionally and aesthetically and would therefore create issues on resale. Even after it is repaired, the house will be without a warranty and have [an] unpleasant 'history' that might impact resale."

(Halloin Aff. Ex. M, p.14.)

77.     The Village of Fox Point assessed the value of the improvements at the Property in 2009, the year the Policy was issued, at $1,550,000. (Halloin Aff. Ex. CC.)

78.     Effective December 31, 2009, the Policy provided Extended Replacement Cost dwelling coverage of $5,296,000 for the Main House. (Halloin Aff. Ex. DD.)

79.     The Policy provides:

> "'Reconstruction cost' means the amount required at the time of loss to repair or rebuild the house whichever is less, at the same location, with the same quality of materials and workmanship which existed before the loss. 'Reconstruction cost' does not include payment for the excavation, replacement or stabilization of land.

16

**Extended replacement cost.** If the payment basis is extended replacement cost, we will pay the reconstruction cost even if this amount is greater than the amount of coverage shown in your policy. However, this payment basis is subject to the following limitations.

If you undertake the construction of your house,, or additions, alterations, or renovations to your house that result in your living out of the house during construction, your payment basis is conditional replacement cost.

If you do not repair or rebuild your house at the same location, the payment basis will be verified replacement cost.

If you cannot repair or rebuild your house because your primary mortgagee or its assignees has recalled your mortgage, we will pay up to the amount of coverage shown in the Coverage Summary minus what is due to the mortgagee.

If you have a partial loss to covered property, we will pay the reconstruction cost less depreciation, unless you begin to repair or replace the lost or damaged property within 180 days from the date of loss.

**Verified replacement cost.** If the payment basis is verified replacement cost, we will pay the reconstruction cost up to the amount of coverage shown in your Coverage Summary whether or not you actually repair or rebuild your house.

If you have a partial loss to covered property, we will pay the reconstruction cost less depreciation, unless you begin to repair or replace the lost or damaged property within 180 days from the date of loss."

(Halloin Aff. Ex. EE.)

80.     In addition to the $5,296,000 extended replacement cost dwelling coverage for

the Main House, the Policy also provides for coverage of up to 20 percent of that

amount (or $1,059,200) for the other permanent structures (the Carriage House

and Beach House). (Halloin Aff. Ex. FF.)

17

81. Chubb never even considered the concept of whether the house was a total loss when it issued the February 11, 2011, adjustment letter, which acknowledged damages of $438,034.99 on the Property's improvements valued at $1,550,000. Mr. Mortensen testified that he never considered or evaluated whether the Property was a total loss.  (Halloin Aff. Ex. D, July 25, 2012, Mortensen Dep. 250:9–257:4.)

82. Mr. Mortensen admitted that he is aware of the fact that the method for doing a total loss analysis is a comparison of the cost of the repair to the assessed value of the improvements at the Property.  (Halloin Aff. Ex. D, July 25, 2012, Mortensen Dep. 253:8–20.)

83. Mr. Mortensen testified that he never compared the dollar amount of damage at the Property to any other number, including the value of the structure or the value of the Property.  (Halloin Aff. Ex. D, July 25, 2012, Mortensen Dep. 257:12–258:4.)

84. The Award acknowledges $1,032,135.01 in damage, and that number does not include the windows, which add an additional $843,345.14, for a total Award of $1,875,480.15.  (DNs 485, 523.)

85. Prior to June 27, 2013, Chubb made payments to the Groniks totaling $521,210.98.  (Halloin Aff. Ex. AA.)

86. When the Award amounts are added to the windows and payments already made ($1,032,315.01 + $843,345.14 + $521,210.98) the undisputed damages are nearly $2.4 million.

## Issue # 11: The Appraisal Addressed Only Property Damage and Not Other Damages, Such as Loss of Use, Damage to Personal Property, and Interest

87. The appraisal process related to the Groniks' insurance claims for property damage to their home. The Policy provides coverage for other losses, such as damage to personal property and loss of use damages. These other losses have yet to be addressed. The Groniks' November 15, 2011, computation and itemization of damages itemizes these damages. (Halloin Aff. Ex. GG, Connelly Dep. Ex. 18.) These damages were itemized and are supported as follows:

    a. **Personal Property**: The Groniks made a claim for damage to their personal property in the amount of $137,239.33. The supporting documentation is attached to the computation and itemization of damages. (Halloin Aff. Ex. GG, Connelly Dep. Ex. 18.) *See also* the November 1, 2011, expert report of Michael McCoy. (Halloin Aff. Ex. HH.)

    b. **Loss of Use:** The Policy provides coverage for loss of use. The Groniks have lost the use of their home and have incurred loss of use damages as a result of having to maintain two houses. These damages were itemized in Exhibit A to their November 15, 2011, damage itemization, but will continue to accrue until their home is made habitable. (Halloin Aff. Ex. GG, Connelly Dep. Ex. 18.)

    c. **Statutory Interest and Bad Faith Claims:** The Groniks have additional claims for interest and bad faith that were not addressed and could not be addressed by the appraisal process.

19

Dated July 22, 2013.

                                        HALLOIN & MURDOCK, S.C.
                                        Attorneys for Plaintiffs


                                         s/ Scott R. Halloin
                                        Scott R. Halloin
                                        State Bar No. 1024669
                                        James J. Irvine
                                        State Bar No. 1088726


HALLOIN & MURDOCK, S.C.
839 North Jefferson Street
Fifth Floor
Milwaukee, Wisconsin 53202
p 414-732-2424
f  414-732-2422
shalloin@halloinmurdock.com
jirvine@halloinmurdock.com
S:\Clients\Gronik\7736 North Beach Drive\Balthasar Action\Pleadings\Stmt. Addl Facts Opp Chubb's MSJ.wpd

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on July 22, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will automatically send email notifications of such filing to the following attorneys of record:

Wendy G. Gunderson, Esq.
Smith, Gunderson & Rowen, S.C.
15460 West Capitol Drive
Suite 100
Brookfield, WI 53005

Timothy A. Bascom, Esq.
Valerie A. Jonas, Esq.
Jacob A. Sosnay, Esq.
Jaclyn C. Kallie, Esq.
Bascom Budish & Ceman, S.C.
2600 North Mayfair Road
Suite 1140
Wauwatosa, WI 53226

Michael J. Cohen, Esq.
Jennifer A.B. Kreil, Esq.
Meissner Tierney Fisher & Nichols, S.C.
111 East Kilbourn Avenue
19th Floor
Milwaukee, WI 53202

Frederick J. Strampe, Esq.
Borgelt, Powell, Peterson & Frauen, S.C.
735 North Water Street
15th Floor
Milwaukee, WI 53202

Todd S. Schenk, Esq.
Ann E. O'Connor, Esq.
Tressler, LLP
233 South Wacker
22nd Floor
Chicago, IL 60606

21

Michael J. Aprahamian, Esq.
Daniel A. Manna, Esq.
Foley & Lardner, LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202

Ralph A. Weber, Esq.
Gass Weber Mullins, LLC
309 North Water Street
Suite 700
Milwaukee, WI 53202

Susan G. Schellinger, Esq.
Heather K. Gatewood, Esq.
Davis & Kuelthau, s.c.
111 East Kilbourn Avenue
Suite 1400
Milwaukee, WI 53202

Jeffrey L. Leavell, Esq.
Kris Bartos, Esq.
Jeffrey Leavell, S.C.
723 South Main Street
Racine, WI 53403

s/ Scott R. Halloin _____