# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DAVID S. GRONIK, JR., et al.,
    Plaintiffs,

v.                                               Case No. 10-CV-00954

SUSAN BALTHASAR, et al.,
    Defendants,

and

SHOREWEST REALTORS, INC.,
CONTINENTAL CASUALTY COMPANY, and
ANNE SCHWARTZ,
    Third-Party Defendants,

and

OPIO BOAT MOON, LLC, et al.,
    Plaintiffs,

v.                                               Case No. 11-CV-00697

CHUBB INDEMNITY INSURANCE COMPANY,
    Defendant.

## DECISION AND ORDER

This highly contentious and prolonged diversity case involves plaintiffs' claims against Chubb Indemnity Insurance Company ("Chubb") for damage done to plaintiffs' home in Fox Point, Wisconsin as a result of three storms. Before me are several motions.

## I. BACKGROUND

On October 22, 2009, plaintiffs purchased property at 7736 North Beach Drive in Fox Point, and Chubb insured the property. After a storm on October 23, 2009, plaintiffs

discovered water leaks and, subsequently, other problems. Plaintiffs brought a claim under the policy seeking reimbursement for damage allegedly caused by various defects. Storms on July 14 and15, and July 22, 2010 caused more leaking, and plaintiffs submitted additional claims.

On February 11 2011, Chubb issued an adjustment letter stating that it had "conducted a simultaneous investigation into all three claims." (Aff. of Scott R. Halloin, Ex. I at 2-4, ECF No. 544-9.) Chubb stated that it had identified the damage it believed to be covered by the policy and had asked Geoffrey Johnson from Belfor Consulting to "analyze the entire home and determine the cost to repair the covered damage." (*Id*. at 4, 15–16.) Based on Johnson's estimate, Chubb concluded that the cost of repair was $438,034.39 and that plaintiffs were entitled to $10,000 for mold remediation.

Plaintiffs disputed both the loss assessment and coverage determinations. Pursuant to its policy and based on the dispute about loss, Chubb asked for an appraisal. Chubb's policy provides:

> If you or we fail to agree on the amount of loss, you or we may demand an appraisal of the loss. Each party will select an appraiser within 20 days after receiving written request from the other. The two appraisers will select a third appraiser. If they cannot agree on a third appraiser within 15 days, you or we may request that the selection be made by a judge of a court having jurisdiction. Written agreement signed by any two of the three appraisers shall set the amount of loss. . . . .

(Case No. 11-CV-00697, Insurance Policy at 6, ECF No. 9-2.) Plaintiffs then commenced the present lawsuit requesting that I resolve the coverage issues prior to the appraisal. Chubb moved to compel plaintiffs to participate in the appraisal. I granted Chubb's motion thinking that it made sense to first establish the amount of plaintiffs' loss and then determine what portion of the loss was covered by Chubb's policy. The parties agreed that

the appraisers would assess the cost of repairing each item of damage claimed by plaintiffs without determining the cause of the damage or whether the damage was covered. Chubb selected Bill Hall as its appraiser, and plaintiffs selected Tony Enea as theirs. The parties were unable to agree on a third appraiser, so I appointed Donald Buettner, an experienced civil engineer, to fill that role. Neither party objected to his appointment.

Enea, who is also one of plaintiffs' expert witnesses, issued a report estimating the cost of repairing plaintiffs' property. He created a 20-page itemized list of repairs that he deemed necessary and the cost of each. (Aff. of Todd S. Schenk, Ex. B at 9–10, 44–64, ECF No. 520-2.) He concluded that the total cost of repair ranged from $3,206,978 to 4,012,520.40, "between $2,758,443.50 and $3,563,985.90" higher than the figure in Chubb's adjustment letter. (*Id.* at 12.) However, unlike Chubb, Enea did not attempt to determine which of the repairs he listed were covered by the policy.[1]

The other two appraisers relied on Enea's list as a statement of the items that plaintiffs believed should be repaired and assessed the cost of repairing each item.[2] Enea stated that his list included two categories: (1) damaged items and (2) items that "were not themselves damaged but are believed to be the cause or part of the cause of damage or necessary to prevent the recurrence of the problems." (Aff. of Tony Enea ¶ 24, ECF No.

---

[1] Enea also checked Johnson's math and concluded that the cost of Johnson's proposed repairs was $27,221.42 more than Johnson had estimated. However, this "math check" was separate from Enea's calculation of the total repair cost. (Schenk Aff., Ex. B at 8–9, ECF No. 520-2.)

[2] See the spreadsheet attached to Part 1 of the appraisal award listing the repairs considered by the appraisers. The list is identical to Enea's list.

485; *see also* Pls.' Br. in Support of Motion to Make Findings Related to the Appraisal Process at 4, 5–6 ECF No. 491 (providing a similar description of Enea's list).)

The first category included more than 400 items, and Enea and Hall agreed on the cost of repairing all but 33 of them. Enea and Hall submitted the 33 disputed items to Buettner who agreed with Hall that 32 of the 33 items were not damaged and that the 33rd item, insulation, would cost $4,859.88 to repair. Buettner disagreed with plaintiffs' assertion that the insulation needed to be replaced with higher quality insulation at a cost of $38,100. The spreadsheet attached to Part 1 of the appraisal award lists the items in Enea's first category and the repair costs of each. The second category included 341 items, which are also listed on the spreadsheet.[3] A note next to each of the items in the second category indicates "no damage" and lists the repair cost as $0.

On May 30, 2013, Hall and Buettner but not Enea signed Part 1 of the award.[4] Part 1 stated that "the sound value and loss and damages" to plaintiffs' property was $1,032,135.01 but noted that the appraisers still needed to price the repair of the windows. (Aff. of Todd S. Schenk, Ex. M at 1, ECF No. 599-13.) On December 18, 2013, some two and a half years after the appraisal process commenced, Hall and Enea agreed that the cost of repairing the damaged windows was $677,217.18 and signed Part 2 of the award. The total appraisal award is $1,709,352.19.

---

[3] The spreadsheet does not separate the items in the two categories, but Enea identified the items in the second category in an exhibit attached to the affidavit he submitted to the court on May 31, 2013. (*See* Enea Aff., Ex. C, ECF No. 485-3.) Each item listed on the exhibit has a number which corresponds to a number on the spreadsheet.

[4] Initially Part 1 consisted of one page but on December 18, 2013 Hall and Buettner amended it to include the 38-page spreadsheet.

## II. DISCUSSION

The first set of motions relate to the appraisal award. Chubb asks me to confirm the entire award. Plaintiffs agree that I should confirm Part 2 but ask me to invalidate Part 1 on the ground that Hall and Buettner did not understand the task assigned to them or, alternatively, because Buettner was not qualified to serve as the third appraiser.

Before considering the parties' motions, I address plaintiffs' argument that the appraisers appraised the damage from the October 2009 storm but not the damage from the July 2010 storms.[5] The record does not support plaintiffs' argument. Chubb's February 2011 adjustment letter addressed all three of plaintiffs' claims. In response, Enea provided an itemized estimate of all the damage caused by all three storms. And the appraisers treated Enea's itemized list as a list of the repairs that plaintiffs believed were required. Thus, the appraisal award addresses all of the repairs that plaintiffs indicated were necessary. If plaintiffs wanted additional items considered they should have submitted them to the appraisers, and plaintiffs have pointed to no item allegedly damaged by the July 2010 storms that the appraisers did not consider.

As to the appraisal award, the award is governed by Wisconsin law.[6] Under Wisconsin law, appraisal processes of the type called for by plaintiffs' policy are a

---

[5] Plaintiffs first made this argument in May 2013. (Pls.' Br. in Support of Mot. to Make Findings Related to the Appraisal Process at 3–4, ECF No. 491; Pls.' Reply Br. at 21–22, ECF No. 540.) I declined to address it at that point because the appraisal process was still ongoing.

[6] "[T]he task of a federal court sitting in diversity is to ascertain the substantive content of state law as it either has been determined by the highest court of the state or as it would be by that court if the present case were now before it . . . ." *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002).

5

permissible form of alternative dispute resolution. *See* Wis. Stat. § 631.85 (allowing an insurance policy to "contain provisions for independent appraisal"). An appraisal is similar to an arbitration, but it is less formal and does not resolve the entire dispute between the parties. *Lynch v. American Family Mut. Ins. Co.*, 163 Wis. 2d 1003, 1009–10 (Ct. App. 1991). The goal of an appraisal is to resolve valuation disputes over the amount of loss. *Id.* All other disputes, including whether the claimed loss is covered by the contract, are left for resolution by negotiation or litigation. *Id.* An appraisal is "a fair and efficient tool" for resolving valuation disputes because it allows "each [party] to appoint an appraiser of their own liking, with a neutral umpire as the deciding vote." *Farmers Auto. Ins. Assoc. v. Union Pacific R. Co.*, 319 Wis. 2d 52, 73–74 (2009). Like an arbitration award, an appraisal award issued by qualified appraisers is presumptively valid and "should not be set aside lightly, even if the court disagrees with the award." *Id.* It can be set aside "only upon the showing of fraud, bad faith, a material mistake, or a lack of understanding or completion of the contractually assigned task." *Id.* "Review of an appraisal award should usually be limited to the face of the award." *Id*. A court should only look beyond the face of the award "[i]f fraud, bad faith, material mistake, or a lack of understanding of the process are reasonably implicated" by the award. *Id.*

Plaintiffs ask me to set aside Part 1 of the award on the ground that Hall and Buettner did not understand the task assigned to them. An appraisal award cannot be set aside simply because the appraisers made a mistake when determining the amount of loss but only if they substantially failed "to appreciate the matter and questions before them." *Dechant v. Globe & Rutgers Fire Ins. Co.*, 194 Wis. 579, 581 (1928). Plaintiffs argue that

6

the appraisers did not understand the task assigned to them because Hall and Buettner did not assess the cost of all of the items submitted to them because they priced many items at $0.

I reject plaintiffs' argument because $0 reflects the appraisers' view that the item in question was not damaged. In their reply brief, plaintiffs argue that the appraisers should have included in the award the cost of completing every repair that plaintiffs contended was necessary regardless of whether the appraisers believed the item in question was damaged. This assertion is one of a number of inconsistent arguments made by plaintiffs. It directly contradicts the statement in their opening brief that the appraisers' job was "to determine what is damaged . . . ." (Pls.' Br. in Supp. of Mot. to Compel Appraisers to Comply with the Appraisal Provision at 4, ECF No. 590.) In any case, Chubb's policy required the appraisers to determine the "amount of loss." This means that if they believed that an item was not in need of repair they could value the loss at $0. *See Farmers Auto. Ins.*, 319 Wis. 2d at 73 (Appraisals "place a difficult factual question—the replacement value of an item—into the hands of those best equipped to answer that question."); *see also Dechant*, 194 Wis. at 581 (noting that appraisers are chosen precisely because they have expertise in the subject matter and they "may properly use their own expert knowledge" when making an appraisal). The appraisers did not have to accept plaintiffs' assertion that an item was in need of repair.

Plaintiffs' primary concern seems to be that Hall and Buettner undervalued two major repairs. Plaintiffs, first, claim that the main house is racking, i.e. swaying in the wind, and that the racking damaged the house's structure and caused many windows to fail. Thus, plaintiffs asked the appraisers to price many repairs designed to stiffen and brace

the frame of the house to stop it from swaying. Hall and Buettner concluded that the house was not racking and that its frame did not need to be stiffened. Thus, they priced the repairs proposed by plaintiff for racking at $0. Plaintiffs also claim that the roof of the main house leaks and must be replaced. Hall and Buettner disagreed, concluding that the roof incurred "no damage" that justified replacing it and awarded $0 for the item. (Schenk Aff., Ex. M at 3, ECF No. 599-13 (Item #13).)[7]

Plaintiffs contend that the appraisers' conclusions that the frame of the house is not damaged and that the roof does not need replacement are mistaken and inconsistent with the evidence. Even, however, if the appraisers were mistaken and underestimated the amount of damage done to plaintiffs' property, such mistake is not a ground for invalidating the award. *See Dechant*, 194 Wis. at 581 (holding that even a substantial difference between the appraisal award and the loss as determined by the jury was not sufficient to justify setting aside an award). When reviewing an appraisal award, my job is not to determine whether the third-party expert accurately valued each individual item (as if I could do a better job) but to determine "whether the third party experts understood and carried out the contractually assigned task." *Farmers Auto. Ins.*, 319 Wis. 2d at 73.

Plaintiffs also argue that the appraisers did not understand their task because they made causation determinations. As noted, the parties here agreed that the appraisers would assess the cost of repairing damaged items and the court would decide causation issues. Because damage caused by certain perils is not covered by plaintiffs' policy, the

---

[7] The appraisers did, however, award sums under other line items for repairs related to the roof. (*See* Schenk Aff., Ex. M at 1–2 (Item #1, 20).)

questions of causation and coverage are closely linked. Plaintiffs contend that the appraisers failed to price the repair of some damage because they believed it was caused by perils not covered by the policy. This argument, however, is without merit.

Although the appraisers discussed causation, the appraisal award shows that they understood that their task was to price all damage regardless of cause. Contrary to plaintiffs' assertion, the appraisers' division of damage into two categories, "Damage to Dwelling caused by Wind and Water events (fortuitous)" and "Other damage needing to be corrected 'cause not address'" (Schenk Aff. Ex. M at 1, ECF No. 599-13) did not affect the appraisal award inasmuch as the appraisers priced every item in both categories and included such prices in the final award.[8] Plaintiffs point out that in some cases the appraisers made notes about causation, but a review of these items shows that the appraisers awarded damages for most of them. And, where they valued an item at $0, they either noted that there was "no damage" or explained that the defect to be corrected was part of the original construction and not due to any damage or alteration of the property. For some of these items, Hall expressly noted that he did not believe the damage was related to plaintiffs' insurance claims but priced the repair anyway. For example, Item #98 calls for the repair of a crack in the foundation of the main house. Hall notes that a repair is needed but that the damage to the foundation is "not related to reported loss events." (Schenk Aff. Ex. M at 6, ECF No. 599-13.) Nevertheless, he awarded $1,900 to repair the crack.

---

[8] Part 1 of the award includes $869,392.40 for damage caused by wind and water events and $162,742.61 for damage caused by other perils.

Of all the items priced by the appraisers, only two raise any questions at all. First, Item #608 calls for replacement of a brick sill. Hall noted that, "Damage noted to brck [sic] sill is maintenance related and is not related to any claimed events," and the appraisers awarded $0 for this repair. (Schenk Aff. Ex. M at 30.) But this $0 award appears to be an error. The columns on the left side of the spreadsheet attached to the appraisal award include calculations for the cost of supplies and labor for this repair, and the appraisers only did this for items where they actually priced the repair. Additionally, the spreadsheet Hall created to show his prices for each repair at the beginning of the appraisal process includes $2,463.80 for this repair. (Aff. of William L. Hall Ex. E-2 at 47, ECF No. 598-7.) This mistake does not suggest much less establish that the appraisers failed to understand their assigned task.

Second, Hall refused to award $32,283.40 requested by Enea to replace the carriage house roof because there was "[n]o damage noted to the roofing." (Schenk Aff., Ex. M at 32 (Item #641).) Buettner sided with Hall on this dispute but noted: "Normal wear and tear when not maintained" and "Cedar [s]hake roof is dead. No maintenance. Roof failure permits water to get behind crown and fascia." (*Id.* at 38) Contrary to plaintiffs' assertion, these brief notes do not show that Buettner made a coverage determination. The appraisers made a number of notes about causation that clearly had no impact on their award. It may well be that Buettner regarded the problems with the roof as minor and not to warrant replacing the roof. In any case, the notes about this item do not justify invalidating the entire award. The carriage house roof was one of more than 700 items considered by the appraisers. And the appraisers' comments throughout the award make clear that the appraisers understood their duties.

Plaintiffs also express concern that the appraisers' causation related comments will impact my coverage determination. The appraisers, however, reached no consensus about causation and in any case their award is binding on me only to the extent that it assesses the loss amount.

Finally, plaintiffs argue that the appraisers did not understand their assigned task because they construed the concept of "loss" too narrowly and refused to price so called "preventive repairs," i.e. repairs presumably required to prevent a recurrence of the damage. Enea included such repairs in the second category of his list.[9] For example, plaintiffs argue that racking caused the windows of the main house to fail and that the frame of the house must be stiffened to prevent a recurrence even if the frame itself was not damaged. They also assert that the landscape must be re-graded to prevent water from accumulating around the house even though the storms did not affect the landscape. Relying on an Iowa case dealing with a general commercial liability policy rather than a property insurance policy, *A.Y. McDonald Indus., Inc. v. Ins. Co. of N. America*, 475 N.W.2d 607 (Iowa 1991), plaintiffs argue that the appraisers should have priced such repairs because Chubb's policy provides "coverage against all risk of physical loss to your house." Generally, however, a property insurance policy providing coverage for "physical

---

[9] Plaintiffs claim in their most recent brief that all of the repairs in the second category are necessary to address "actual damage observed at the property" and "not preventative measures, additions, or betterments." (Pls.' Reply Br. at 20, ECF No. 603.) However, they already admitted that the second category includes repairs that are necessary "to address the cause of the damage" and not items that are themselves damaged. (Pls.' Br. in Support of Motion to Make Findings Related to the Appraisal Process at 4, 5–6 ECF No. 491; Pls.' Reply Br. at 8, ECF No. 540.) They cannot reverse position now, especially in light of the fact that Enea made the same admission in his affidavit. (*See* Aff. of Tony Enea ¶ 24, ECF No. 485.)

11

loss" is triggered when a piece of tangible property has been physically altered by some peril. *See* 10A Steven Plitt, et al., Couch on Insurance § 148:46 (3d Ed.). Plaintiffs ask me to construe the policy to provide coverage for improving portions of the property that have not been altered. Plaintiffs' proposed construction would arguably convert the policy into a warranty as to the condition of the property, and the policy does not contain such a warranty. This issue has not, however, been fully developed and, in any case, ought not to be resolved in this phase of the proceedings. Therefore, I will definitively address it at summary judgment along with any other coverage issues. I reiterate, however, that the purpose of the appraisal was to determine the amount of physical damage to the property and the cost of repairing such damage.

Alternatively, plaintiffs seek to invalidate the portion of the appraisal award signed by Buettner on the ground that Buettner was biased and thus not qualified to serve as the third appraiser. Plaintiffs previously attempted to disqualify Buettner on the ground that his previous employer did work for Chubb. I disagreed concluding that there was no "evident partiality" on Buettner's part. *See Borst v. Allstate Ins. Co.*, 291 Wis. 2d 361, 385–86 (2006); *see also* 15 Steven Plitt, et al., Couch on Insurance § 211:33 (3d ed.) ("The interest or bias that disqualifies [an arbitrator or appraiser] must be direct, definite, and demonstrable as contrasted with remote, uncertain, or speculative."). Plaintiffs now argue that I should disqualify Buettner because, after the appraisal was complete, Chubb asked him to sign an affidavit describing his work on the appraisal. Contrary to plaintiffs' assertion, it is not at all clear that Chubb's communication with Buettner was improper but, even if it was, it is not a sufficient basis for invalidating the award inasmuch as it took place after the appraisal was completed.

I will also deny plaintiffs' request to reopen discovery to enable them to depose Buettner regarding the possibility of other *ex parte* communications with Chubb's counsel. Plaintiff presents nothing suggesting that such communications occurred. *See Farmers Auto. Ins.*, 319 Wis. 2d at 77 (noting that discovery into the appraisal process is only available if a party makes a prima facie showing of "fraud, bad faith, material mistake, or a failure to understand or complete the contractually assigned task").

Therefore, I will confirm the appraisal award. Plaintiffs suggest that the appraisers still need to price the repair of additional windows, but Part 2 of the award, which was signed by both Hall and Enea, states that it appraises the ""windows that need to be replaced, Cost to replace" and prices the repair at $677,217.18. (Schenk Aff. Ex. N at 1, ECF No. 599-14.) Thus, with respect to the windows, the appraisal is complete.

I will grant plaintiffs' unopposed motion to reopen discovery for 45 days to inquire into Chubb's recalculation of the amounts due under the policy as indicated in Chubb's letters of June 2013 and January 2014.

I will also grant Chubb's motion to strike the November 2012 rot report attached to the report of plaintiffs' expert Dr. Kim Anderson. This report discusses the results of tests done for wet and dry rot on wood from the windows at the property. Plaintiffs state that they do not intend to rely on this report. I will also grant Chubb's request to take Dr. Anderson's deposition. Following this deposition, Chubb may disclose its rebuttal expert, presumably Doug Rice, and plaintiffs may depose such expert. Plaintiffs argue that it is too late for Chubb to disclose a new expert witness, but I will allow it because of the delays in testing the windows.

Finally, I will deny without prejudice plaintiffs' motion for summary judgment filed on April 11, 2014. I stayed the deadline for summary judgment briefing so I could address the dispute over the appraisal award. Now that I have done that, I will set new deadlines so that the parties can combine the briefing for their two summary judgment motions.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that plaintiffs' motion to compel appraisers Bill Hall and Donald Buettner to comply with the appraisal provision (Docket #589) is **DENIED**.

**IT IS FURTHER ORDERED** that Chubb's motion to confirm the appraisal award (Docket #595) is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiffs' motion to reopen discovery on Chubb's readjustment of plaintiffs' claims (Docket #608) is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiffs' motion to disqualify Donald Buettner, or in the alternative to depose him (Docket #609) is **DENIED**.

**IT IS FURTHER ORDERED** that Chubb's motion to amend/correct its cross-motion and memorandum in support of its cross-motion to confirm the appraisal award (Docket #613) is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiffs' motion for leave to file a reply brief and supporting affidavit (Docket #618) is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiffs' motion for summary judgment on the policy's rebuilding code provision (Docket #621) is **DENIED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Chubb's motion to strike or stay plaintiffs' motion for summary judgment (Docket #628) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Chubb's motion to strike the previously stricken rot report filed by plaintiffs (Docket #631) is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiffs' motion to strike Chubb's expert rebuttal disclosure of Doug Rice (Docket #635) is **DENIED**.

**IT IS FURTHER ORDERED** that the deadline for the completion of plaintiffs' discovery into Chubb's recalculation of the amounts due under the policy in June 2013 and January 2014 and the depositions of Dr. Kim Anderson and Doug Rice is **August 15, 2014**.

**IT IS FURTHER ORDERED** that the parties shall abide by the following scheduling when filing motions for summary judgment: (1) Chubb shall file its motion for summary judgment on or before **September 1, 2014**, (2) plaintiffs shall have **21 days** following the filing of Chubb's motion to file a combined brief in opposition and motion for summary judgment, (3) Chubb shall have **21 days** following the filing of plaintiffs' motion to file a combined reply brief in support of its motion and brief in opposition to plaintiffs' motion, and (4) plaintiffs shall have **15 days** following the filing of Chubb's brief to file a reply in support of their motion.

**IT IS FURTHER ORDERED** that the court will hold a telephone status conference on **July 1, 2014** at **11:00 a.m.** to discuss the possibility of resolving this case. The court will initiate the call. Attorneys who will be participating should call 414/297-1285 to advise the court of their participation.

Dated at Milwaukee, Wisconsin, this 17th day of June, 2014.

s/ Lynn Adelman
_____
LYNN ADELMAN
District Judge