## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

_____

**DAVID S. GRONIK, JR., et al.,**
                              **Plaintiffs,**


**v.**                                                    **Case No. 10-cv-0954**

**SUSAN BALTHASAR, et al.,**
                              **Defendants,**

**and**

**SHOREWEST REALTORS, INC.,**
**CONTINENTAL CASUALTY COMPANY, and**
**ANNE SCHWARTZ,**
                              **Third-Party Defendants,**

**and**

**OPIO BOAT MOON, LLC, et al.,**
                              **Plaintiffs,**


**v.**                                                    **Case No. 11-cv-0697**

**CHUBB INDEMNITY INSURANCE COMPANY,**
                              **Defendant.**
_____

## DECISION AND ORDER

Plaintiffs, the Groniks, brought this diversity case against defendant Chubb Indemnity Insurance Company ("Chubb") for damages to their home resulting from several storms. On June 17, 2014 after a lengthy appraisal process, I confirmed the appraisal award. Subsequently, the parties filed motions which I now address.

### I. Appraisal Award

I first address plaintiffs' argument directed to the appraisal award. Part 1 of the appraisal award originally consisted of one page but in December 2013 was amended to

include a 38-page spreadsheet, and Part 2 of the award addresses the cost of repairing the damaged windows. In response to defendant's summary judgment motion, plaintiffs suggest that at least part of the appraisal award is invalid because counsel for the defendant misled me regarding the nature of the spreadsheet. Plaintiffs' argument, which is difficult to follow, seems to be that Part 1 of the award should not include the spreadsheet because the neutral appraiser, Donald Buettner, did not approve it.

"[A]s a rule courts should be loathe [to revisit prior decisions] in the absence of extraordinary circumstances." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988); *Urologix, Inc. v. Prostalund AB*, 256 F. Supp. 2d 911, 914 (E.D. Wis. 2003) (concluding that "courts generally should not reopen issues once decided" and that courts "will view belated factual or legal attacks with great suspicion" (internal quotations and citation omitted)). This policy is "based on the salutary and sound public policy that litigation should come to an end." *Rothner v. City of Chi.*, 929 F.2d 297, 301 (7th Cir. 1991) (internal quotations and citation omitted). Thus, I will reconsider my confirmation of the appraisal award only if I am "convinced that [it was] clearly erroneous and would work a manifest injustice." *Arizona v. California*, 460 U.S. 605, 618 n.8 (1983).

Plaintiffs do not argue that confirmation based on the arguments presented was clearly erroneous. Rather, they present a new argument for invalidation. Plaintiffs should have raised this argument when I was considering motions relating to the appraisal award and, by not doing so, waived it. *Fujitsu Ltd. v. Netgear, Inc.*, No. 07-cv-710, 2009 WL 3047616, at * 24 (W.D. Wis. Sept. 18, 2009), *rev'd in part on other grounds*, 620 F.3d 1321 (Fed. Cir. 2010) ("[F]ailure to raise [an] issue at the appropriate time . . . amount[s] to

waiver of the argument."). Further, I find no manifest injustice. Even if I were to disregard the spreadsheet, the original one-page award specifies the same amount of damages as the spreadsheet.

## II. Motion to Strike Affidavits

Defendant asks me to strike large portions of affidavits submitted by plaintiffs in conjunction with their summary judgment filings on various grounds including that they contain statements which contradict previous testimony, opinions not previously disclosed in expert reports, opinions of unqualified individuals and lay testimony not based on personal observations. I may only consider admissible evidence in assessing the parties' motions for summary judgment. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). When a party relies on affidavits to support its position on summary judgment, the affidavit "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Additionally, a party may not use information to support its summary judgment position if it was required to disclose that information under Rule 26 and failed to do so, Fed. R. Civ. P. 37(c)(1), and may not "creat[e] 'sham' issues of fact with affidavits that contradict their prior depositions." *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168–69 (7th Cir. 1996) (applying the "sham affidavit rule" to both party and witness affidavits).

First, defendant asks me to strike portions of Michael Corrigan's affidavit in which Corrigan offers expert testimony related to windows because Corrigan is not competent to offer such testimony. Corrigan is a licensed structural engineer, and his affidavit testimony

relates to whether "racking" (structural movement caused by wind) contributed to or caused the window damage. Corrigan appears qualified to offer this testimony thus I decline to strike it. Nor does Corrigan's affidavit directly contradict his testimony that "there were other experts that were addressing [the topic of seal failures] specifically" and that he is "not a window expert." These statements were not an admission that he is unqualified to opine on the effects of racking on windows, and his statement that he could not "confidently attest to . . . any other potential contributing factors [aside from structural movement] to the seal failures," Schenk Aff. Ex. M, at 4 (ECF No. 709-13), does not directly contradict his testimony that "strong winds coupled with driving rain, sleet or ice are causing [the] window seal failures and pops," Corrigan Aff., at 3 (ECF No. 685). *See Bank of Ill.,* 75 F.3d at 1169–70 ("A definite distinction must be made between discrepancies which created shams and discrepancies which create an issue of credibility or go to the weight of the evidence."). Similarly, Corrigan's deposition testimony that the house can be repaired "without tearing it down and starting over," Schenk Aff. Ex. M, at 5 (ECF No. 709-13), does not directly contradict his affidavit statement that he does "not believe it to be reasonable or prudent to attempt any sort of repair to this structure," Corrigan Aff., at 7 (ECF No. 685). Further, Corrigan's opinions expressed in his affidavit are not new. The theory that racking caused the window seals to fail was disclosed in his report. *See* Corrigan Aff. Ex. A, at 5 (ECF No. 685-1) ("As the racking occurred seams between constructed assemblies such as . . . windows . . . have opened up and permitted moisture entry.").

However, I will strike the portion of the affidavit in which Corrigan states that water entering from the master bedroom windows and balcony roof "damaged the LVL support beams immediately below in the kitchen area." Corrigan Aff., at 7 (ECF No. 685). Although

4

plaintiffs previously disclosed that Corrigan "recommend[ed] that the LVL beams . . . which exhibited delaminating due to contact with moisture be removed or replaced," Corrigan Aff. Ex. A, at 5 (ECF No. 685-1), his opinion that the moisture damage was caused by water entering through the master bedroom windows and balcony roof is new. I will also strike the portion of Corrigan's affidavit in which he opines that "the house is a total loss and should be razed." Corrigan Aff., at 7 (ECF No. 685). Plaintiffs are unable to point to any disclosure in Corrigan's expert report or deposition testimony where he presented a "total loss" opinion; rather plaintiffs argue that the opinion is based on his observations of the loss after Chubb's 2014 readjustment, but plaintiffs never amended or otherwise sought to disclose this new expert opinion to defendant.

Second, defendant asks me to strike portions of Anthony Enea's affidavit in which he expounds on the appraisal process. I will disregard these comments because, as indicated, I decline to re-examine the validity of the appraisal award. I also will disregard Enea's opinions about the cause of window damage, window rot, and roof damage because they constitute new information not previously disclosed in his expert reports or depositions. Enea's expert report specifically states, "I have not and will not make any representations as to responsibility, but instead worked with others to identify damage . . . and then priced the needed repairs." Enea Aff. Ex. B, at 2 (ECF No. 686-3). Further, when discussing the roof in his report, Enea does not mention wind or storm damage as a cause, and the closest he comes to opining on the cause of leaks is his mention of undersized gutters and incorrectly installed ice and water shield. *Id.* Similarly, Enea does not mention window seal failures or window rot at all in this report.

Third, defendant asks me to strike portions of Jay Karls' affidavit in which he

expresses an opinion that storms and racking caused the window seals to "pop" or fail and led to leaks and eventual rot. Defendant argues that this seal "pop" theory is new and thus should not be considered. However, in Karls' expert report, he states that: "[T]he windows have water damage, broken seals and window pops. . . . The resulting losses occur as follows: wind shear causes the house to rack, which results in the windows torquing within their sashes, which results in the windows losing their seals and popping, which results in additional water infiltration." Halloin Aff. Ex. CC, at 4 (ECF No. 145-29). This is consistent with Karls' affidavit statement that "the cause of the widespread window failures are wind and rain storms, that has caused the outer piece of glass on the windows to deform, stretch or twist, in turn resulting in the seal at the edge breaking." Karls Aff., at 2 (ECF No. 688). However, I will strike the portion of Karls' affidavit in which he opines that "[n]either caulk nor paint can stop a window seal pop or failure" and that "painting or caulking actually worsens the condition." *Id.* at 4. Karls' statement in an expert report that water may penetrate and damage a structure "even if properly maintained" is not sufficient to make defendant aware of his opinion that painting or caulking cannot stop and could even worsen a window seal failure.

Fourth, defendant asks me to strike portions of Kim Anderson's affidavit in which he opines that the rot observed on the windows is "soft rot" as opposed to "dry or wet rot." Defendant argues this soft rot theory is new and thus should not be considered. Plaintiffs point to no expert report or deposition testimony in which Anderson disclosed his "soft rot" theory but rather rely on the deposition testimony of Chubb's expert, Doug Rice, in which he admitted that he saw evidence of soft rot and that testing found "no identifying characteristics of any particular species of wet or dry rot." Halloin Aff. Ex. 37, at 5, 9 (ECF

No. 693-7). Plaintiffs argue that Anderson merely agreed with Rice's assessment in his affidavit, but Anderson never issued a rebuttal report in response to Rice's deposition testimony. However, all of this, including Rice's deposition, took place after defendant filed its summary judgment motion and during summary judgment briefing, so I will give plaintiffs the benefit of the doubt and allow the opinion. Defendant was already aware of the rot test results and aware of plaintiffs' line of questioning at Rice's deposition regarding "soft rot" versus wet or dry rot; Anderson's opinion could not have been much of a surprise.

Defendant also asks me to strike Anderson's statements opining that the cause of the window damage is failure or "popping" of the window seals, arguing that as a toxicologist, he is not qualified to provide expert testimony regarding the window seal failures. However, Anderson's toxicology Ph.D program required him to obtain a minor in civil engineering, and plaintiffs provide a supplemental affidavit regarding his experience investigating causes of water leaks as part of his mold investigations. This is sufficient.

Fifth, defendant asks me to strike portions of Patrick O'Neil's affidavit in which he describes odors coming from plaintiffs' personal property, arguing that this expert opinion was not previously disclosed. Plaintiffs argue that O'Neil's observations of odors were based on personal knowledge as a fact witness, not an opinion rendered by an expert, and thus were not subject to disclosure under Rule 26. Plaintiffs identified O'Neil as a fact witness in its Rule 26(a) disclosures, and O'Neil may provide such testimony in an affidavit if it is rationally based on perception and personal knowledge. Fed. R. Evid. 701(a); Fed. R. Civ. P. 56(c)(4). Therefore I will allow his statements regarding odor. I also conclude that O'Neil's previous deposition testimony that he could not recall "any [other] property that he determined could not be cleaned regardless of cost," Schenk Aff. Ex. Q, at 4 (ECF No.

709-14), does not directly contradict his affidavit statement that plaintiffs' decision not to clean items a second time because of the cost was prudent. Thus, I will not strike any portion of O'Neil's affidavit.

Sixth, defendant asks me to strike portions of Kelly Reimer's affidavit in which he states that the there are new leaks in the roof, arguing that this contradicts his previous testimony. It appears that during Reimer's deposition, there was some confusion related to the timing of Reimer's reports and when he observed new leaks. This is not enough to render an affidavit a "sham." *Bank of Ill.*, 75 F.3d at 1170 ("Variations in a witness's testimony and any failure of memory . . . create an issue of credibility as to which part of the testimony should be given the greatest weight."). Defendant also asks me to strike portions of Reimer's deposition in which he opines that wind and racking caused the window seals to fail leading to leaks, arguing that this directly contradicts Reimer's deposition testimony. When asked, "Can a storm . . . can a new window which is closed, can water come in through either the seals or anything around that without being defective?" Reimer responded, "It should not. Water should not come through and if it does, I would say that window is defective." Schenk Aff. Ex. S, at 8 (ECF No. 709-19). However, Reimer also previously opined that "A large number of window failures at the Property are attributable to popped window seals. The popping of these window seals necessarily occurred rapidly, when the gas held between the panes suddenly escaped." Reimer Aff., at 2 (ECF No. 606). Thus, his statement in his most recent affidavit that "[t]he predominant cause of the window damage at the Property is seal failures, which are also commonly referred to as seal pops" is not new and does not contradict his previously disclosed opinions.

Finally, defendant asks me to strike portions of plaintiff David Gronik's affidavit, arguing that portions offer improper expert testimony, improper legal opinion, speculation, and irrelevant emotional pleas. Plaintiffs concede that Gronik's affidavit is not expert testimony and that portions of his affidavit express his "strongly held personal beliefs." Gronik's Resp. Br. in Opp'n to Chubb's Mot. to Strike and/or Limit Affs., at 42 (ECF No. 715-3). I will disregard Gronik's affidavit statements to the extent that they are irrelevant or not based on personal knowledge. Defendant also asks me to strike portions of Gronik's affidavit in which he describes an odor coming from his personal property, arguing that this was not properly disclosed during discovery. Like O'Neil's odor testimony, this is not offered as expert testimony but as testimony based on personal knowledge and observation, and I will therefore consider it.

### III. Summary Judgment Issues

I first address the substantive issues raised in the parties cross-motions for summary judgment. I may grant summary judgment where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. In determining whether summary judgment is appropriate, I consider all the evidence submitted by the parties, and I draw all inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The parties agree that the substantive issues are governed by Wisconsin law.

The principal issue raised by the summary judgment motions is whether under the policy defendant is obligated to pay for the losses identified in the appraisal. To answer this question, I first examine the facts of the insured's loss to determine whether the policy makes an initial grant of coverage. *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 268 Wis. 2d

16, 32 (2004). The burden is on the insured "to prove that his or her loss falls within the policy's broad grant of coverage." *Kozlik v. Gulf Ins. Co.*, 268 Wis. 2d 491, 498 (Ct. App. 2003). If there is an initial grant of coverage, I next examine the policy exclusions to see whether they preclude coverage of the claim. *Am. Girl, Inc.*, 268 Wis. 2d at 32–33. If an exclusion applies, I examine exceptions to the exclusions which may reinstate coverage. *Id.* at 33.

## A. Issues Involving Whether the Policy Makes an Initial Grant of Coverage

## 1. Known loss doctrine

I next address whether certain losses identified by the appraisal such as deterioration of the windows and others predated the policy and were known to the plaintiffs and are thus not included in the policy's initial grant of coverage. "Insurance does not cover losses that have already occurred or that are known." 1 Arnold P. Anderson, *Wisconsin Insurance Law* § 1:10 (6th ed. 2010). *See also City of Edgerton v. Gen. Cas. Co.*, 172 Wis. 2d 518, 560 (Ct. App. 1992), *rev'd in part on other grounds*, 184 Wis. 2d 750 (1994) ("It is fundamental that an insurer does not insure a loss which has already occurred."); *American Girl, Inc.*, 268 Wis. 2d at 58 ("[T]he known loss doctrine holds that insurers are not obligated to cover losses which are already occurring when the coverage is written or which has already occurred" where the loss is "known" or "substantially known."). The policy is also clear that it only provides coverage for losses "occurring within the policy period." Mortensen Aff. Ex. A, at 27 (ECF No. 666-1). Thus, in order to show that the items defendant claims are precluded by the known loss doctrine are included in the policy's initial grant of coverage, plaintiffs must show that the losses did not occur before

the policy went into effect and were not known or substantially known to them when the policy was issued.

I conclude that a genuine issue of material fact exists as to whether plaintiffs knew or substantially knew of the losses defendant claims are precluded by the known loss doctrine before the policy went into effect. Plaintiffs first attempted to purchase the house in 2008 but walked away because their inspection showed many of these defects, including window deterioration, roof issues, and pool equipment corrosion. Additionally, when plaintiffs purchased the house in 2009, they did so at significant discount and did not have the house re-inspected to confirm that the defects had been repaired. However, plaintiffs present evidence that the Balthasars, the previous owners, told them that the defects at issue had been fixed and provided them with repair receipts as confirmation.[1] Thus, whether plaintiffs knew about the losses is a question for the factfinder.[2]

---

[1] I reject plaintiffs' argument that defendant cannot take advantage of the known loss defense because it also knew of the loss. The Balthasars' previous claims were unrelated to the windows, roof and pool equipment and thus could not have put defendant on notice of these problems. Further, the notice that plaintiffs gave to defendant about such problems occurred after coverage commenced, not before.

[2] The known loss doctrine is distinct from the loss in progress doctrine, which precludes coverage when the insured "secures insurance with the knowledge of an ongoing, inevitable progression that may result in a loss." 1 Arnold P. Anderson, *Wisconsin Insurance Law* § 1.9 (6th ed. 2010). The loss in progress doctrine does not appear to have been adopted by the Wisconsin courts. *Atl. Mut. Ins. Co. v. Lotz*, 384 F. Supp. 2d 1292, 1299 (E.D. Wis. 2005); *Miller v. Safeco Ins. Co.*, 683 F.3d 805, 810 (7th Cir. 2012) (recognizing that Wisconsin uses the "continuous trigger" theory of loss, which holds that a loss occurs continuously from exposure until manifestation and all policies in effect during the ongoing occurrence are triggered). Thus, this affirmative defense is unavailable to defendants.

## 2. Betterments

Defendant also argues that several repairs are not covered losses because they are betterments or preventive measures. The policy covers a "physical loss" which generally occurs when a piece of tangible property has been physically altered by some peril. 10A Steven Plitt, et al., *Couch on Insurance* § 148:46 (3d ed.). This is true even of modern, all-risk policies. *Id.*; 2 Arnold P. Anderson, *Wisconsin Insurance Law* § 6.10 (6th ed. 2010) (stating that an all-risk policy still requires a showing of "loss or damage caused by an outside force or agency" (internal quotations and citation omitted)). Thus, the policy does not cover repairs necessary to prevent future loss or to better the structure in the absence of a physical loss.[3] Further, the policy limits defendant's obligation to the "reconstruction cost," defined as the cost to rebuild or repair "with the same quality of materials and workmanship which existed before the loss." Mortensen Aff. Ex. A, at 29 (ECF No. 666-1). Thus, even when a physical loss triggers coverage, the policy does not require defendant to cover costs which would put the home in a better condition than before the loss.

Plaintiffs argue that the policy's "Rebuild to Code" provision requires defendant to cover certain preventive and betterment costs. The provision requires defendant to "cover the cost of conforming to any law or ordinance that regulates the repair, rebuilding, or demolition of your house or structure *made necessary by the covered loss*." *Id.* at 32 (emphasis added). Thus, in order to invoke this provision, plaintiffs must show a covered physical loss the repair of which involves a building code.

--------

[3] Plaintiffs' argument that betterments are covered because the policy lacks a betterments exclusion is without merit. To establish coverage, both the law and the policy require plaintiffs to show a physical loss.

Some of the betterment and preventive costs plaintiffs seek, such as the addition of gutters and landscape re-grading, were valued at $0 in the appraisal, and plaintiffs admit that such repairs "address the cause of the damage." Pls.' Br. in Supp. of Mot. to Make Findings Related to the Appraisal Process, at 4, 5–6 (ECF No. 491); Pls.' Reply Br., at 8 (ECF No. 540); Decision & Order, at 11 n.9 (ECF No. 694). Thus, plaintiffs fail to show that these items constitute physical losses covered by the policy.

One of the major "betterments" at issue is the addition of shear walls to strengthen the structure of the house. The house never had shear walls, thus shear walls are, by definition, a betterment. Further, the appraisal award valued shear wall installation at $0, concluding that shear walls were not required. Schenk Aff. Ex. JJJ, at 11 (ECF No. 669-12). However, plaintiffs argue that shear walls are required by the Rebuilding to Code provision because "after the window leaks, the roof leaks and the water damage to the kitchen, the Main House no longer satisfies the current building code with respect to lateral force resisting elements." Groniks' Br. in Opp'n to Chubb's Mot. for Summ. J., at 17 (ECF No. 703). Not being in compliance with the current building code alone is not a covered physical loss. Plaintiffs seem to argue that the windows are a covered physical loss[4] and that the window repair requires the installation of shear walls to comply with current building codes. Assuming the windows are a covered loss, the appraisal award accounted for current building code requirements, *see, e.g.*, Schenk Aff. Ex. JJJ, at 6 (ECF No. 669-12) (accounting for "code-required floor drain" in line item 117 and new drywall on backside as "required by code"). The appraisal did not conclude that shear walls were required by

---

[4] Whether the windows are a covered physical loss is disputed and will be discussed below.

the current code either to repair structural damage or to repair the windows, and that determination is conclusive. Thus, plaintiffs do not show that the installation of shear walls is a covered loss under the policy.

The second major "betterment" at issue is the replacement of the roof. The appraisal award determined that roof replacement is not required and awarded $0, although it did award repair costs. Thus, plaintiffs do not show that roof replacement is a physical loss covered by the policy and do not attempt to show that it is required by the Rebuilding to Code.

### 3. LVL beams

In January 2014, defendant agreed to cover three window sections in the master bedroom. Plaintiffs argue that defendant should also cover the repair costs of the laminated veneer lumber (LVL) support beam in the kitchen as well as some kitchen cabinet replacements and ceiling removal because these were ensuing losses caused by the master bedroom window leaks.[5]  Plaintiffs rely on Corrigan's opinion that the master bedroom windows caused the water damage to the LVL beam. However, I previously struck this opinion from Corrigan's affidavit. Also, plaintiffs do not point to anything in the appraisal award regarding damage to the LVL beam. Thus, plaintiffs cannot recover for alleged LVL damage.

### 4. Miscellaneous items

The appraisal awarded damages for several miscellaneous items that defendant argues are not covered losses. The first are line items 19 and 508 which defendant argues

---

[5] The parties focus on the LVL beam, presumably because it is the most expensive repair.

are related to shear wall installation and thus not covered. Plaintiffs make no contrary argument, and I find for defendant on this point. Defendant also argues that line items 119, 120, 138, 139, and 141, for which the appraisal awarded damages, deal with sewer and sump pump upgrades and are betterments and not covered losses. Plaintiffs do not dispute that these upgrades are betterments. Thus, I find for defendant on this issue.

The appraisal also awards damages for erosion to the beach, which defendant argues is not a covered loss because the beach is not covered "property." Generally speaking, the policy covers only the house. However, in the event of repair of a covered loss to the house, defendant is obligated to "pay up to 10% of the amount of the covered loss . . . for the excavation, replacement or stabilization of the land." under or around the house. Mortensen Aff. Ex. A, at 31 (ECF No. 666-1). There is no evidence that the repair of a covered loss to the house requires the beach erosion-related repairs. Plaintiffs seem to argue that the "deluxe" nature of their masterpiece policy requires the repairs, but the policy makes clear that it provides "coverage against all risk of physical loss to your *house* unless stated otherwise or an exclusion applies." *Id.* at 29 (emphasis added). Thus, defendant also prevails on this item.

Finally, the appraisal awarded damages for front door repair, but defendant argues that its experts found no damage and thus it is not a covered loss. However, the appraisal is controlling on the issue of damage, and defendant puts forward no other argument as to why the front door damage is not covered under the policy's initial grant of coverage. Thus, plaintiffs meet their burden of establishing a physical loss under the policy.

## B. Whether An Exclusion Precludes Coverage

Defendant argues that certain physical losses as covered by the policy's initial grant

of coverage come within one of the policy's exclusions. I construe exclusions narrowly against the insurer and analyze each exclusion separately. *Am. Girl, Inc.*, 268 Wis. at 33. Defendant has the burden of proving an exclusion. *Kozlik*, 268 Wis. 2d at 498.

### 1. Windows

Defendant argues that even if the windows are physical losses included in the policy's initial grant of coverage, several exclusions relieve defendant of the obligation to cover their repair costs.[6] First, defendant cites the Gradual or Sudden Loss exclusion, which excludes coverage for damage caused by gradual deterioration, wear and tear, or dry or wet rot. Plaintiffs argue that the rot involved is "soft rot" and not "wet or dry rot." Both parties cite the same authorities, and plaintiffs also rely on test results indicating no wet or dry rot fungi present in the windows. The evidence presented does not definitively resolve whether the wet or dry rot sub-exclusion applies. Thus the question must be resolved by the finder of fact.

Plaintiffs also dispute that the gradual deterioration and wear and tear sub-exclusions apply because in their view the initial window damage was caused by the failure of the window seals and was sudden. But even if the initial damage was sudden, the ensuing damage—the deterioration of the windows caused by water infiltration—was not. Thus, under this scenario, plaintiffs could only recover the cost to repair the seals, not the gradual deterioration. To avoid this result, plaintiffs argue that the window seal failures were caused by storms and thus are a non-excluded covered loss which requires

---

[6] As noted above, whether plaintiffs knew of window damage prior to buying the house and obtaining the policy and thus whether the windows are included in the policy's initial grant of coverage is an issue for the fact finder.

defendant to replace the entire window unit including the deteriorated portions. Defendant counters that the window damage was not caused by storms but by inadequate repairs and lack of proper maintenance and are thus excluded by the Faulty Planning, Construction or Maintenance exclusion and the Neglect exclusion. Defendant also argues that even if the window seal failures are a non-excluded covered loss, it need not replace the entire window but only the glass pane. However, defendant's expert stated that "in most cases, there were multiple seal failures per window" and that "the windows with multiple panes with seal failures should be fully replaced." Schenk Aff. Ex. Z-2, at 2 (ECF No. 667-28). Thus, the cause of the window damage (storm damage or faulty repairs and maintenance) and the appropriate repair (replacement of the window units or glass panes) present issues of fact.[7]

### 2. Beach house

Contrary to plaintiffs' assertion, the appraisal award encompassed items relating to the beach house including the installation of doors, plumbing and fixtures, roof repairs, painting and caulking and the replacement of insulation and flooring. Defendant, however argues that several exclusions apply. First, it contends that the Faulty Planning, Construction or Maintenance exclusion, which excludes "any loss caused by the faulty acts errors or omissions of you or any other person in planning construction or maintenance," Mortensen Aff. Ex. A, at 36 (ECF No. 666-1), excludes certain roof repairs because the

---

[7]To the extent that plaintiffs contend rot and deterioration are covered as ensuing losses caused by an initial covered loss (i.e. the seal failure), the argument fails. The policy covers ensuing losses "unless another exclusion applies, " Mortensen Aff. Ex. A., at 34 (ECF No. 666-1), and the Gradual or Sudden Loss exclusion precludes coverage of deterioration.

flashing was improperly installed. Plaintiffs appear not to dispute this assertion, Groniks'

Resp. to Chubb's Statement of Undisputed Facts, at 87 (ECF No. 679) (admitting that the

roofing expert noted "that there were no base or cap flashings"), thus I find for defendant

on the issue. Defendant also argues that the Gradual or Sudden Loss exclusion precludes

coverage of damaged ceiling joists based on deterioration due to long-term water

infiltration as does the Faulty Planning, Construction and Maintenance exclusion to the

extent that the deterioration resulted from defective construction or repairs. Plaintiffs do not

contest this argument thus I find for defendant.

Finally, defendant argues that the Structural Settlement exclusion precludes

coverage of certain damage to the beach house's main room because the damage was

caused by the settling of the structure. Plaintiffs respond that this damage was caused by

a "storm surge" in the basement which lifted a portion of the beach house off of its floor

joists, citing its expert Karls' observation of dripping floor joists after a flood. Although Karls

acknowledges that the structural settlement may also have caused the damage, plaintiffs

present enough to bar summary judgment. This issue must be resolved by the finder of

fact.

### 3. Observation holes

Next, I address the repair of holes which plaintiffs' experts cut into walls in order to

observe damage. Defendant argues that the policy does not cover repair of these

observation holes because plaintiffs intentionally created them. *See* Mortensen Aff. Ex. A,

at 36 (ECF No. 666-1); *see also Hedtcke v. Sentry Ins. Co.*, 109 Wis. 2d 461, 483–84

(1982) ("[I]nsurance covers fortuitous losses and . . . losses are not fortuitous if the

damage is intentionally caused by the insured."). Plaintiffs respond that they created the

18

holes in order to mitigate damages and to protect the property. *See id.* at 484 (listing the public policy objectives of excluding intentionally caused damage as "(1) avoiding profit from wrongdoing; (2) deterring crime; (3) avoiding fraud against insurers; and (4) maintaining coverage of a scope consistent with the reasonable expectations of the contracting parties"). However well-intentioned plaintiffs were in creating the holes, the policy "does not cover loss caused intentionally" Mortensen Aff. Ex. A, at 36 (ECF No. 666-1). Thus, repair of the observation holes is excluded.

### 4. Miscellaneous items

In their brief, plaintiffs fail to respond or respond minimally to several of defendant's exclusion arguments. However, in their response to defendant's statement of facts plaintiffs do respond to these arguments[8]. First, plaintiffs dispute defendant's contention that the Dampness or Temperature exclusion, which excludes coverage of damage caused by "air dampness" and "water vapor," and the Faulty Planning, Construction or Maintenance exclusion, preclude coverage of stains on the roof framing and decking. Defendant cites expert opinions that high humidity and condensation in the attic caused the stains, but plaintiffs counter with contrary expert testimony. Thus, this issue must be resolved by the fact finder. Second, plaintiffs dispute defendant's argument that the Gradual or Sudden Loss exclusion precludes coverage of cracks in the chimney cap because the cracks were

---

[8] Where I found disputes created by plaintiffs' response to defendant's statement of facts, I considered them although I am not required to do so. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) ("It is inappropriate to make legal arguments in a . . . statement of facts."); *Albrechtsen v. Bd. of Regents of the Univ. of Wis. Sys.*, 309 F.3d 433, 436 ("Judges are not like pigs, hunting for truffles buried in the record."); Fabiyi *v. McDonald's Corp.*, No. 11-cv-8085, 2014 WL 985415, at *2 (N.D. Ill. Mar. 13, 2014) (disregarding factual and legal arguments made in a statement of facts").

caused by long-term deterioration and exposure to the elements. However, plaintiffs cite as evidence an expert report that "the leaking chimney caps . . . is not the cause of" the roof leaks, Enea Aff., at 3 (ECF No. 686), which does not contradict the evidence indicating that deterioration caused the cracks in the chimney. Thus, coverage of this damage is excluded. Third, the parties disagree on whether the Gradual or Sudden Loss or Faulty Planning, Construction or Maintenance exclusions preclude coverage of damage to the front door. However, the evidence on the issue is inconclusive making it a question for the fact finder.

Fourth, plaintiffs dispute defendant's contention that the Gradual or Sudden Loss; Dampness or Temperature; or Faulty Planning, Construction or Maintenance exclusions exclude coverage of certain electrical and mechanical repairs. Defendant's experts opine that much of this damage was caused by normal wear and tear, gradual deterioration, and inadequate maintenance and that some of it resulted from high humidity around the pool area and from improper installation. The report that plaintiffs cite in response merely states that the electrical equipment has suffered a physical loss and does not contradict defendant's experts. Thus, defendants are entitled to summary judgment on the electrical repairs issue. However, the record does not support defendant's contention that "mechanicals in the basement mechanical room constitute installation issues." Thus, I will not grant summary judgment regarding whether the Faulty Planning, Construction or Maintenance exclusion precludes coverage of the mechanicals.

Fifth, plaintiffs dispute defendant's contention that the Gradual or Sudden Loss, Structural Movement or Faulty Planning, Construction or Maintenance, or Neglect exclusions preclude coverage of various drywall and paint touch-up expenses. Defendant's

expert opines that the drywall cracks were caused by either wear and tear, structural settling or a failure to properly maintain the property. Plaintiff's experts dispute this, citing the cause as racking. Thus, the cause of the drywall cracks and paint touch-ups must be determined by the fact finder. Finally, defendant argues that various exclusions preclude coverage of additional line items from the appraisal including woodpecker hole damage, the cost of the roof and chimney inspections, duplicative costs associated with basement water issues, and sales tax on uncovered items. Plaintiffs do not respond to these arguments thus defendants prevail.

## C. Total Loss

Plaintiffs argue that the factfinder could determine that their property was a total loss and, if it did, defendant would have to pay the face value of the policy rather than the reconstruction cost. Wisconsin's valued policy law requires an insurer to pay the full face value of a policy "[w]henever any policy insures real property that is owned and occupied by the insured primarily as a dwelling and the property is wholly destroyed." Wis. Stat. § 632.05(2). The Wisconsin Supreme Court has approved a jury instruction stating that: "total loss is when the identity of the structure as a building is destroyed so that its specific character as such no longer remains." *Fischer v. Harmony Town Ins. Co.*, 249 Wis. 438, 442 (1946); *see also Wickman v. State Farm Fire & Cas. Co.*, 616 F. Supp. 2d 909, 916–17 (E.D. Wis. 2009) (concluding that no reasonable fact finder could conclude a house was "wholly destroyed" where "the structure remained standing"). Under this test, no reasonable juror could find that plaintiffs' house was "wholly destroyed." The structure still stands and is identifiable as a house.

The valued policy law also requires an insurer to pay the face value of a policy when

a party shows a "constructive total loss," which occurs when a municipality issues a raze order thereby precluding the owner from rebuilding. *Gambrell v. Campbellsport Mut. Ins. Co.*, 47 Wis. 2d 483, 489–90 (1970). A municipality may issue a raze order "[i]f a building is old, dilapidated or out of repair and consequently dangerous, unsafe, unsanitary or otherwise unfit for human habitation and unreasonable to repair." Wis. Stat. § 66.0413(1)(b). A rebuttable presumption exists that it is unreasonable to repair a building if the cost of repairs "would exceed 50% of the assessed value of the building divided by the ratio of the assessed value to the recommended value as last published by the department of revenue for the municipality within which the building is located." § 66.0413(1)(c). Plaintiffs argue that under this formula, the Village of Fox Point could have issued a raze order for their building. Plaintiffs asked the Village to do so but defendant responded that "if the Village were to issue an order requiring the Groniks to raze their home, without allowing them the option of repair, Chubb would have no choice but to file an action in circuit court, under Wis. Stat. Section 66.0413(1)(h), for a restraining order." Halloin Aff. Ex. 48, at 2 (ECF No. 694-3). The Village declined to issue a raze order. Plaintiffs characterize defendant's letter as threat and argue that a jury could conclude that the Village could have issued a raze order but did not because of defendant's interference, and that the property could thus be considered a constructive total loss.

Municipalities have discretion to enforce ordinances even when violations are "open and notorious." *Vretenar v. Hebron*, 144 Wis. 2d 655, 664–65 (1988). And courts may not "compel the manner in which a governmental body exercises discretion." *Id.* at 666. Thus, plaintiffs' constructive total loss argument fails. The Village exercised its discretion in deciding not to issue a raze order, and neither I nor a finder of fact may second-guess that

decision. The fact that the Village considered the legal positions of the parties and the ongoing litigation over the property in its decision is of no consequence. The Village has not precluded plaintiffs from rebuilding, thus no constructive total loss has occurred.

## D. Inflation

The parties also dispute whether under the policy plaintiffs are entitled to an inflation adjustment on the covered repair costs. Defendant contends that the policy only requires it to pay the "reconstruction cost," which the policy defines as "the amount required at the time of the loss to repair or rebuild the house," and thus does not require it to pay inflation past the "time of the loss." Mortensen Aff. Ex. A, at 29 (ECF No. 666-1). Plaintiffs, however, argue that they are entitled to an inflation adjustment based on language stating that: "During the policy period, the amount of coverage will be increased daily to reflect the current effect of inflation." *Id.* However, this language refers to an inflation adjustment to "the amount of coverage," i.e. the policy limit, not the reconstruction costs. *Id.* Thus, plaintiffs are not entitled to an inflation adjustment but only the cost of repairs at the time of the loss.

## E. Additional Living Expenses

With respect to living expenses, the policy states:

**Extra Living Expenses.** If your house cannot be lived in because of a covered loss, we cover any increase in your living expenses that is necessary to maintain your household's normal standard of living. We cover these expenses for the reasonable amount of time it should take to repair or rebuild your house, or for your household to relocate, even if the policy period ends during that time.

**Fair rental value.** If a part of your house you generally rent to others cannot be lived in because of a covered loss, we cover its fair rental value. We will pay up to this amount for the reasonable amount of time it should take to repair o rebuild that part of your house, even if the policy period ends during that time.

Mortensen Aff. Ex. A, at 31 (ECF No. 666-1). Defendant reimbursed plaintiffs $21,205.82 for expenses associated with moving and storage and a one-night stay at a hotel and disputes plaintiffs' claim for additional living expenses of $2,502,131.21, $732,131.21 for increased baseline expenses and $1,770,000 in estimated rental value. When the house at issue became uninhabitable, plaintiffs moved into their old house and have maintained both houses ever since. Defendant argues that plaintiffs are not entitled to the costs of maintaining two homes because they are not an "increase" in costs—plaintiffs maintained both homes prior to the flooding which displaced them. Plaintiffs respond that these are increased costs because Plaintiffs intended to sell or rent their first home and would have done so but for the flooding. David Gronik states that he declined offers to sell and rent the property. Thus, whether these expenses are increased expenses necessary to maintain plaintiffs' standard of living is a fact issue as is the question of what amounts to a "reasonable amount of time" under the policy.

Plaintiffs also contend that they can recover the estimated rental value of the damaged house, seeming to argue that they are entitled to the value they might have spent to rent a comparable property. The policy, however, which only obligates defendant to reimburse actual increases in living expenses, does not support this claim. Plaintiffs seem to rely on *U.S. v. Didier*, No. 12-CR-36, 2013 WL 5524592 (D. Mont. Oct. 4, 2013). However, even assuming *Didier* supported plaintiffs' argument, the decision has since been overturned. Thus defendant prevails on the issue.

## F. Personal Property

The policy also covers physical losses to personal property and obligates defendant

to "pay the full cost to replace the contents." Mortensen Aff. Ex. A, at 37–38 (ECF No. 666-1). Plaintiffs claim $137,293.33 in personal property damage based on a physical loss involving a "noxious odor." Defendant contends that any such loss was limited to mold damage for which it has paid the $10,000 policy limit. It is not clear whether the damage to personal property was caused by mold or severe flooding and sewer backups in the basement where the property was stored. Thus, the matter is for the factfinder.

## G. Proofs of Loss

I next address whether defendants may assert as an affirmative defense at trial that plaintiffs failed to comply with their duties under the policy. Plaintiffs submitted numerous documents to defendant itemizing damage to the house including an interactive floor map. Defendant continued to ask plaintiffs to estimate a cost of repair, but plaintiffs listed the damages amount as "undetermined" rather than providing dollar estimates. Plaintiffs' answer was sufficient. Plaintiffs responded to defendant's multiple requests for additional information, and their failure to provide a damages estimate does not put them in breach of the policy. Further, defendant has already covered $700,000 in damages and participated in the appraisal which estimates the cost of repairs. Thus, plaintiffs did not breach the policy by not providing sufficient proofs of loss.

Similarly, I conclude that plaintiffs' list of damaged personal property was sufficient. Defendant argues that plaintiffs only produced a list of personal items, not a list of damaged items. However, the record indicates that plaintiffs believed that "all of the personal property . . . sustained a direct 'physical loss,'" and that defendant was aware of this. Mortensen Aff. Ex. D, at 13 (ECF No. 666-4). Thus, plaintiffs satisfied their duty to

provide a list of damaged items.

Defendant, however, may argue that plaintiffs breached their duty to protect the property from further damages. The policy requires plaintiffs to take steps to do so, Mortensen Aff. Ex. A, at 36 (ECF No. 666-1) ("We do not cover any loss caused by your failure to use all reasonable means to protect property before, at, or after the time of loss."), and defendant has provided enough evidence to enable a reasonable jury to find in its favor.

### III. Motion to Strike Bad Faith Portion of Defendant's Summary Judgment Motion

I deny plaintiff's motion to strike defendant's bad faith argument and because I have not granted defendant's summary judgment motion in its entirety, I decline to grant defendant summary judgment on the bad faith issue.

### IV. Motion to Amend Answer and Counterclaim

Finally, defendant seeks leave to amend its answer to add a counterclaim for a set-off based on plaintiffs' settlement with the Balthasar defendants and requests discovery on the issue. I generally grant leave to amend, Fed. R. Civ. P. 15(a)(2), except where there is undue delay, bad faith, undue prejudice to the other party, or the amendment would be futile. *Perrian v. O'Grady*, 958 F.2d 192, 194 (7th Cir. 1992). Although it is late in the litigation, defendant has shown good cause for amending its answer to include a setoff counterclaim. Defendants could not have filed a setoff counterclaim prior to the Balthasar settlement, which occurred in June 2013. Defendant sought information related to the settlement through discovery but was denied access (based on the terms of the settlement agreement). It did not gain access to the terms of the settlement until June 2014, when a

copy of the agreement was unsealed. It then promptly moved to amend.

Plaintiffs' argument that amendment would be unfairly prejudicial by delaying summary judgment briefing is now moot. Further, I disagree that the amendment would be futile. Plaintiffs argue that Wisconsin's collateral source rule, which prohibits tortfeasors who are legally responsible for causing an injury from reducing their damages based on payment from other sources, *Ellsworth v. Schelbrock*, 235 Wis. 2d 678, 684 (2000); 2 Arnold P. Anderson, *Wisconsin Insurance Law* § 10.30 (6th ed. 2010), bars defendant's right to a set-off, but plaintiffs offer no case law to support their argument that the collateral source rule would bar defendant from recovering a setoff where it is not legally responsible for causing the property damage at issue. Nor have plaintiffs supported their argument that defendant's waiver of subrogation rights constitutes a waiver of its rights to a set off.

Plaintiffs also argue that defendant may not recover a setoff amount until the insured is fully compensated, citing *Ruckel v. Gassner*, 253 Wis. 2d 280, 287 (2002), and that because they allege nearly $50 million in damages and the Balthasar settlement covered only one-tenth of that amount, the settlement has not made them whole. However, the actual amount of plaintiffs' damages is a fact issue, and thus it is not certain that amendment would be futile.

Finally, plaintiffs argue that the settled claims are separate and distinct from the claims against defendant and the settlement is thus irrelevant. Specifically, the claims against the Balthasar defendants included bodily injury claims, and the settlement agreement specifically states that all payments made under the settlement agreement be allocated solely toward the bodily injury claims. However, defendant was not a party to the settlement agreement which allocated all payment toward bodily injury claims and thus is

not bound by it. *See Home Ins. Co. v. Tooke*, 174 Wis. 2d 47, 52–53 (Ct. App. 1993) (concluding that insurer was not bound by the terms of a settlement agreement which allocated the payment amount between compensatory and punitive damages because it was not a party to the agreement). Further, defendant's argument that some portion of the Balthasar settlement is, in fact, attributable to the property damage and not the bodily injury claims is persuasive enough to allow it to explore the issue through limited discovery.

THEREFORE, **IT IS ORDERED** that defendant's motion to amend/correct answer (ECF No. 650) is **GRANTED**.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment (ECF No. 662) is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that plaintiffs' motion for partial summary judgment (ECF No. 680) is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that plaintiffs' motion to strike Chubb's request for summary judgment on bad faith (ECF No. 700) is **DENIED**.

**IT IS FURTHER ORDERED** that defendant's motion to file oversized memorandum (ECF No. 707) is **GRANTED**. The Clerk shall file defendant's Reply in Support of its Motion for Summary Judgment.

**IT IS FURTHER ORDERED** that defendant's motion to strike and/or limit affidavits (ECF No. 711) is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that plaintiffs' motion to file excess pages (ECF No. 715) is **GRANTED**. The Clerk shall file plaintiffs' Reply Brief in Support of Their Motion for Partial Summary Judgment and plaintiffs' Response Brief in Opposition to Chubb's Motion

to Strike and/or Limit Affidavits.

**IT IS FURTHER ORDERED** that a telephonic status conference will be held on **March 24, 2015** at **10:30 a.m.** to discuss scheduling of discovery and briefing on defendant's setoff counterclaim. The court will initiate the call.

Dated at Milwaukee, Wisconsin, this 3rd day of March, 2015.

s/ Lynn Adelman
_____
LYNN ADELMAN
District Judge